Mr. Clement, whenever you're ready. Thank you, Your Honors, and may it please the Court. Paul Clement for Jeld-Wen. Multiple critical aspects of the proceeding below were unprecedented and wrong. The exclusion of evidence concerning the acquired company's weakened financial condition, the divestiture order in a private antitrust case filed years after the challenge acquisition, and a massive future loss profits award premised on speculation that a profitable company will go out of business next September are all unprecedented and deeply flawed. But I would like to begin with Steve's failure to prove antitrust impact and injury, as it requires throwing out the antitrust verdict in total. This case presents a classic case of a breach of contract case dressed up in antitrust garb in an effort to procure treble damages. Steve's and Jeld-Wen entered into a long-term supply agreement before the acquisition closed that largely insulated Steve's from the possibility of price increases based on post-acquisition exercises of market power. Perhaps for that reason, Steve's never tried to prove that it had paid higher prices post-acquisition than it would have had in a but-for world without the acquisition taking place and with CMI still in the market. Judge Floyd, you're muted. You used the word but-for just a moment ago. Is that the requirement, but-for causation to recover under the Clayton Act in this circuit? We think it is, Your Honor. I mean, I will say that I don't know that there's accepted law on these issues in the Fourth Circuit, but I do think even at the Supreme Court level it is clear that in order to show antitrust injury, antitrust impact, you need to show an injury from a but-for world without the acquisition or without the merger. I think that's fairly clearly established that that is how you prove antitrust injury, and I think particularly a case like this where you have the possibility of a long-term contract that they insulate a consumer from the consequences of the merger, I think it's particularly important to establish that the customer is worse off because of the merger and is paying higher prices than they would in a but-for world without the merger. I think that's critical, and that's how you differentiate injuries that you're suffering from a reduction in And at least as I read my friends on the other side's brief, I really don't think that they took too much issue with that because they accepted the multiple cases that established the proposition that if you're suing for the identical loss that you could otherwise sue for under a contract, that in those situations you are effectively in a position where you are not recovering antitrust injury, but you're recovering something else. And so just to try to emphasize that, I think that this need to show this but-for injury is absolutely critical, and I think it also sort of underscores some of the other errors in the case. Because if, for example, Dublin had carried its burden, or rather, Steve's had actually done what it was supposed to, which is show an injury compared to the but-for world, then the evidence of CMI's financial condition would be absolutely critical, and obviously so. Because if CMI is a weakened competitor, and it's a price taker not a price maker, then there's going to be very difficult for Steve's to show an injury in the but-for world. But yet Judge Payne completely excluded that evidence, and he excluded on a basis that is absolutely clear legal error under the Supreme Court's general dynamics case. The Supreme Court in general dynamics heard the argument from the government that evidence of an acquired firm's weakened financial condition was irrelevant if the defendant, the antitrust defendant, wasn't mounting a failed company defense. The Supreme Court in the general dynamics decision, I don't know how they could have made it clear that that is not a valid basis for not having that evidence introduced. Counsel, this is Judge Rushing. Why isn't the CMI evidentiary ruling harmless error? Everyone seems to agree it's not a very strong defense in favor of your client, but I was wondering whether it's reversible here. Well, I think it's absolutely reversible error, Your Honor, and I think the reason is it's not that we were trying to make a failed company defense and were unable to do it. What we were trying to show is that, in fact, if CMI had stayed in the market, Steve's would have been no better off, no worse off, because CMI, because it was a failing company, because it was a weakened company, even if it would have remained in the market, it still wouldn't have a material impact on prices. And with all due respect, I don't think you can dismiss that as a harmless error, because if you think about this case, Steve's walks in and tells the jury, this is the easiest case in the world, because there was a merger that reduced the market from three competitors to two. That must be bad. Now, the very first thing you'd want to say as an antitrust defendant to explain why that's not bad is the difference between three and two here didn't make that big a difference, because the prices in the market were really being set by Masonite and Jelwin. CMI was a failure. If the merger didn't happen, Steve's would effectively be in the same position. It certainly wouldn't be paying any lower prices in a world without the merger. So I hope you'll sort of see that, particularly in a world where Steve's is held to its burden of showing that prices are higher with the merger than they would be in a but-for world without the merger, particularly when they're held to that burden, the evidence of what CMI would be doing and whether it would be setting prices, increasing prices, lowering prices is absolutely critical. So are those two, you think both of those are errors, and I'm wondering if they're connected. If we think there was an adequate antitrust injury alleged here, now maybe the damage model was wrong, but that doesn't seem to be an issue on appeal. But if we think that there was an injury and we take the case as it played out, except for the CMI evidence being excluded, do you still have a case that it would have changed if it's not harmless error, that it could have changed the determination by the jury that there was an antitrust violation? Yes. Those are independent errors, and we think it's clearly still an error and still clearly prejudicial error, even in a world where they're allowed to prove the injury that they were allowed to prove. I mean, I think if in essence their answer to our argument that they didn't show a but-for world and they didn't show antitrust injuries, well, yeah, we sort of did. And our expert sort of alluded to it a little bit. Then I think it becomes even clearer that our inability to go and cross-examine the expert on the basis of the fact that CMI was a weakened competitor and couldn't make a material impact on the market, I think all of that becomes much more obviously problematic. But I think even in the case that was actually tried, that evidentiary error is an independent ground which we're entitled to a new trial. Now, I think the antitrust injury and the lack of proof of the antitrust injury is a basis for judgment in our favor. And I understand the premise of your question was that maybe you don't agree with that, but I really think that that is pretty clearly the right answer in this case. And if you walk into an antitrust case and you prove the identical damages on your breach contract theory as you do for your antitrust theory, that is a clear signal that you are not proving up antitrust injury and antitrust impact. What they've effectively proved is that Steve's was worse off compared to a but-for world in which Gelsman never violated the contract. But what they needed to prove and didn't prove is that Steve's was worse off compared to a but-for world where CMI stayed in the market and continued to exist as a company. And that's what's fundamentally wrong with all due respect to think about the problem here is that we weren't making a failed company defense. Because the idea of a failed company defense is CMI wouldn't be around at all. But even if you're not making a failed company defense, and this is the teaching of general dynamics in International Harvester, even if you're not making a failed company defense, you're not saying CMI would disappear from the market on its own. But you're saying that CMI might sort of struggle along as a kind of ineffectual player in this market. That's what we were absolutely precluded from demonstrating. And to be clear on how clear an error this is, not only is it directly contrary to the But Judge Payne himself admitted that there was no case where anybody had ever excluded this kind of evidence before. And his only justification for that is, well, this is a jury trial and those other cases were bench trials. So the evidence has to come in. I have a couple of questions. I'll start with this one. I thought Judge Payne's evidentiary ruling on this issue was premised on his view of the market conditions that existed at the time where he indicated, or at least the evidence supported, the view that all of the Dwarfskin manufacturers were not in the best of shape at the operative time, but with the expectation that market conditions would improve. So if that's true, then why isn't that? I mean, how do we – I don't know how we test that for an abuse of discretion if the evidence supports it. Well, Your Honor, this is what I would say. That might have been an argument that Steve could have made to the jury about why CMI's weakened financial condition wasn't that big a deal. But it's not a valid basis for Judge Payne to exclude the evidence. And again, I do think that both the Supreme Court general dynamics case and the Seventh Circuit international harvester case are really clear that you can admit evidence of the target's weakened financial condition even when you're not making a failed company defense. So what should have happened here, Judge Payne should have let the evidence in, just as it comes in in every other merger case, as even he admitted. And then if Steve and their lawyers want to say, don't worry about that, they were just having a bad couple of months because of the housing slowdown, they could have put that evidence in, and they presumably would have had their expert also opine. Again, if they proved that case the right way, they'd have their expert opine. And here's what door prices would be if CMI stayed in the market, if CMI, in fact, was just having a bad couple of months, and we would have paid lower prices. But that's not what they proved up, and getting back to the antitrust injury point, what they proved up is not that they would have paid less, but that they paid Geldwin too much under the contract based on the terms of the contract. And that just isn't antitrust. We're not saying that if you have a contract, you can never bring an antitrust case. It's just that when you bring an antitrust case and you actually show antitrust injury and impact, your damages are going to be independent of your contract damages. Just to provide an illustration, one of the things that Steve says in response is, well, even under the contract, we could buy 20% of our doors from somebody other than Geldwin. So if they wanted to prove that they paid more for the 20% of the doors they bought from somebody else, or they wanted to prove that we couldn't buy the 20% from somebody else because of the merger, and so we ended up paying Geldwin more than we would have paid on an open market with CMI as a competitor, that dealt with it. We cleaned the antitrust injury. But that's not what they proved. They proved that, well, we were worse off because under the contract, we should have gotten the Madison and Monroe doors for a particular price, and Geldwin wouldn't include Madison and Monroe doors in the contract until we paid more than we should. Can I ask, you were talking about this lost profits remedy and how it appears to be on its face adequate given the circumstances in which these entities found themselves. But as I understand Judge Payne's view of things, the reason why he allowed the jury to make that calculation as imperfect as it might be is because of the possibility that a divestiture might never come to bear because of the various market conditions, et cetera, and the like. Are you saying that that was improper to allow it to come to a jury at all, or are you saying that once having calculated that number, that that by itself excludes any other potential equitable remedy? Well, a couple of points, Judge Diaz. First of all, we're saying that having the particular future lost profits theory that Steve's mounted go to the jury was an error. We're not saying that they couldn't have proved up future lost profits some other way. If they said, look, because of the merger, we're paying 10% more for door skins than we should be. And so for the next eight years, we want to basically damage it in the amount of that 10% more that we're paying. That would be fine. If the jury accepted that argument, I don't think I'd be here making that argument. I'd still be arguing that the future lost profits award precludes the divestiture award because it provides an adequate remedy at law. I think there are distinct problems with this particular future lost profits award, and it's really the speculativeness of this notion that Steve's is going to go out of business in September of 2021. Notwithstanding, there are multiple different ways that Steve's could continue to be a viable business. Notwithstanding the fact that Steve's itself survived for two years between 2010 and 2012 buying door skins on the spot market. But my point making that point to be clear, Judge Diaz, is not to try to make an argument that could have been made to the jury about why those future damages shouldn't be awarded. It's that any damages theory that is premised on a profitable company going out of business in the future and forcing the jury to say, do you think it's more likely than not that Steve's will go out of business in September 2021? That's not a question that we ask juries because it's just too future speculative. And if you look at the Fifth Circuit's SureShot case, the Fifth Circuit there rejected a very almost identical effort to try to say, well, SureShot is going to go out of business in two years when they wouldn't be able to renew their contract. The Fifth Circuit in that case said they wouldn't even stand it because it was too speculative. Did you challenge the jury instructions on the antitrust injury? And if not, why not? So I don't believe that we challenged the specific jury instruction that asked the jury to see if there was antitrust injury. And in fact, we suggested that jury instruction, I believe. But we preserved throughout, not an instructional error, but the argument throughout. It started in the motion dismissed and went all the way through the JMOL. We argued throughout that Steve had not proved antitrust injury because it had just proven a contract injury. And we also argued that they hadn't proved antitrust injury because they hadn't put on a case about what prices would be, but for the merger. So we preserved what I think of more as a legal argument than an instructional argument. So what do you think about the divestiture order? I mean, we obviously think if you get past the antitrust injury issue and you don't order a new trial on the basis of the exclusion of the evidence, and you get to the question of whether the divestiture order is proper, I think there are multiple problems with the divestiture order, but maybe the most glaring and obvious is the lashes problem. Because no court that I've read, I've tried to read every Section 7 merger case that's out there, no court has ordered divestiture in a private antitrust case when the effort to get the divestiture didn't essentially precede the confirmation of the merger. And there are all the cases that we cite in our papers where courts have rejected as barred by lashes effort to get divestiture, even if it's brought on the eve of the merger or the day of the merger. And I know the Justice Department is going to argue in a little bit, and they're going to say there shouldn't be a bright-line rule. And we're not asking for a bright-line rule, but we do think it's equity. Equity doesn't like bright-line rules. But if you think about the nature of the Section 7 claim, it's really a claim for prophylactic relief that the merger is about the threat and competition. And if you want to enjoin the merger or force a divestiture to the extent there have been preliminary steps taken in the merger, you need to do that right up front. You can't wait for a couple of years and see how things turn out and then seek to get divestiture as a remedy. And if you want to think about how Judge King committed a clear reversible legal error in his lashes analysis, I would submit it's this. He started the whole analysis with the premise that if the request for divestiture was brought within the four-year statute of limitations for a Clayton Act damages claim, that that made it sort of presumptively timely. In which respect, that's exactly wrong. I have a question about that. It did seem that the judge focused on the damages claim. Steve couldn't have known that they would have had this damages claim and how much it would be until further down the road. But Steve seems to rely, for their antitrust injury, on these market-based carve-outs to their contract. The 20 percent, the 3 percent price relation, and other things. And I didn't see the judge addressing why those injuries wouldn't have been foreseeable or threatened, I guess is what the law requires, at the time that the merger was announced. So, Judge Ross, you have two points in response to that. One is, I think the reason that Judge Payne didn't focus on the 20 percent argument is, with all due respect, that's not the argument that Steve was making at the time. It was not the argument that they made to the jury. They really were making the argument that we suffered antitrust damages because Jelgwin violated not the 20 percent provision, but the provisions of the contract say that we have to get doors, and we have to get doors at a certain price, and we get the Monroe and the Madison doors. So part of the reason Judge Payne didn't focus on that is that it really wasn't their theory below. But the second point, and I think this is maybe the more important point, is I think by focusing on that, you're focusing on something very important, which is, in a sense, Steve and Judge Payne can't have it both ways. They can't say that Steve was excused for the first two years from bringing a damage action or bringing any action, because for the first two years, they thought the contract protected them, and they weren't really injured. They can't, I mean, if their claim is a breach of contract claim, then they can wait two years, they can wait three years, whatever the contract statute of limitations is, and then bring their claim for damages. But if the gravamen of their claim is the merger, then their claim was right the day the merger took place. They should have ran into court. Again, for purposes of challenging the merger, they would have had to show completed antitrust injury. They could have showed a threatened injury, and they could have gotten that merger stopped that day, and it would have saved my company the trouble of all of the integration efforts, all of the additional capital investments in the company, and Judge Payne never confronts that. And it does go back to this problem that he really is applying, as a presumptive timeliness measure, the damages cause of action. And I think that it's problematic for the first two years that Steve's waiting. It's also problematic for the second two years. I'm sorry, Judge Hayes. That's okay. I guess part of the problem here is that when you're dealing with a private actor in the context of latches, the private actor, by definition, is focused on its own injury, not necessarily focusing on a broader market. And so I wonder how you think about whether a latches analysis is different simply because we're dealing with a private actor. Well, I think it is different, Your Honor, and I think that's why disastrous orders in private antitrust suits are relatively rare. Because, you know, for the most part, you're expecting that the Justice Department is going to look out for the public interest and enjoy the merger. Obviously, the Supreme Court in California against the American store said it's possible to have a disastrous order in a private case. But in most of the cases, we haven't really seen that, and we've seen this uniform precedent that says, in the context of private suits, that latches apply to preclude the remedy unless it's very timely sought. So I don't think there's any disconnect between latches and private efforts to get a merger enjoined or stopped in its tracks. But I do think it's logical that since it is a private party who's mostly focused on their own injuries, if they are going to wait and see how things play out and see whether they're really injured in their own private capacity, then that's fine. They get to do that, but they lose their ability to seek the early injunctive remedy. And instead, they get their adequate remedy as their damages. And as I was alluding to, Judge Payne excused the first two years of Steeves not filing suit because it wasn't yet clear that the contract wouldn't protect him. He then excused the next two years based on the fact that Steeves was pursuing the speed resolution proceedings with Jellawine. And again, that's perfectly good analysis and perfectly good justification for not bringing damage to action. Of course, if you're going back and forth and you're talking numbers and you might get the whole thing resolved, nobody wants you to go to court and file a damage to action. But it's not a good enough excuse to allow all of the integration that takes place with a merger to go on for two more years. And I'm sure my friend from Steeves will come up and tell you, well, Judge Payne made some findings that the integration wasn't as complete and the accounting systems were still separate and all of that. But nobody can deny that four years into the merger, there was a lot of integration. Nobody can deny that there were investments that wouldn't have been made if the merger had been stopped in its tracks. Even Judge Payne conceded that a divestiture here would cause Jellawine to have to divest a plant that has this door trim line that has nothing to do with door skins at all in the relevant markets. And so another way of thinking about this is if you wait four years after a merger to order a divestiture, the divestiture starts to look like a very punitive remedy as opposed to an equitable remedy. If you run into court immediately or, again, the Justice Department wants to say, well, you've got to give private parties time to talk to the Justice Department first, that's fine. If we were talking about Steve's waiting long enough to talk to the Justice Department, that might explain a week of delay, a month of delay. It would not explain four years of delay. And I don't think anything would be possible. Mr. Clement, I'm sorry. You're a little bit over, so I'm going to stop you there and turn to the other side. You've got some time for rebuttal. Thank you very much. Appreciate it, Your Honor. Ms. Owings. May it please the Court, Taylor Owings for the United States. The government takes a position on only two of Jeldwin's points that it briefed. I will focus first on the reasons that Jeldwin's approach to latches in consummated merger cases should be rejected and, second, on the reasons that the district court was correct to exclude evidence of the DOJ's investigation into the merger at issue here. First, as to latches. Jeldwin urges on this court an erroneous approach that would effectively bar private litigants from challenging mergers once they are consummated. Its distinction between unwinding mergers and blocking them preemptively is one that the Supreme Court rejected in California v. American stores at footnote 11. I disagree with Mr. Clement about the jurisprudence on this issue. The court in American stores was specifically addressing a situation where the merger had closed and American stores, the defendant there, raised the issue of the difference between rescinding what was already a consummated merger and blocking a merger preemptively, and the court specifically rejected that distinction at footnote 11. The court went on to hold that private plaintiffs suffering the anti-competitive effects of a merger can pursue that, quote, most effective remedy to return the market to a competitive state. In the government's experience, a plaintiff who waits until the consummation of a merger may have several good reasons for the delay. Even the government sometimes challenges consummated mergers because the likely effects of a merger were too difficult to identify or to prove in advance. In 2017, for instance, the DOJ challenged Parker Hennepin's consummated acquisition of a fuel filtration business, even though that transaction had been pre-notified to the government under the Hart-Scott-Rodino Act. In 2012, the Federal Trade Commission reported that in the prior three years, approximately one-fifth of its merger challenges had been to consummated transactions. As compared to the government, a private plaintiff faces additional difficulties that may often justify delay. They have limited investigative powers and the requirement to demonstrate standing, as Judge Diaz was discussing a moment ago. Indeed, I'm not sure the concept of standing is possible to reconcile with Geldwin's argument on latches. In order for a cause of action to accrue, a plaintiff may have to wait to sue until they feel or see or are able to reliably conjecture. Yes, Judge? Just to be clear, are you taking a position on whether Steve would have had standing as of the time of the merger here, or are you just saying as a general principle it's something to consider? It's something to consider, Your Honor. We are not taking a position on whether Steve demonstrated standing here. However, I'm trying to paint a picture for the court of the dilemma that a private plaintiff might face as a general matter. As Judge Diaz was pointing out, the rule that Geldwin would have the court apply would require private plaintiffs or rather market participants to pay attention prospectively to every merger that might affect their business and try to investigate on their own what the effects might be, of course, without the investigative powers that the government has. In fact, a plaintiff may have to speculate that they would feel effects and then sue in order to get any powers of discovery that would allow them to prove that prospective harm. My last point on the issue of latches is that the antitrust enforcement scheme that Congress designed would suffer if the court applied Geldwin's approach. Section 16 of the Clayton Act gives private plaintiffs the role of enforcers by allowing them to seek injunctive relief to remedy anti-competitive effects in a market. Structural remedies, whether unwinding the original transaction or setting up a new independent competitor through some other design, are often the most effective way to restore competition in a market damaged by anti-competitive acts. Yes or no? So just so I understand the government's position here, you are eschewing a bright-line rule, but what rule, if any, would you have us apply with respect to latches, or is it dependence? Of course, it's a fact-intensive inquiry, Your Honor, and so the answer is it depends. However, I think the distinction that I would draw with the way Mr. Clement characterized the situation is that Geldwin's focus on the importance of consummation and the effects it would have in creating hardship for the consummated entity are not factors that go to the plaintiff's diligence. Of course, as time goes on in any individual case, the chances, as a probabilistic matter, are higher that the plaintiff will have sat on their hands. That's simply sort of a truism. But the fact of consummation and the hardships that it creates for the defendant is a factor that's much more properly considered under the equitable test for injunctive relief and the remedy that the court should fashion to redress and solve the anti-competitive effects in the market. On the question of equitable relief, and it's fine if your answer is the government has no position on this, but how on earth can we tell if competition is being restored to the market via divestiture here when we don't know who, if anyone, is going to take over the divested entity? It might be Steve, it might be someone else, it might be no one. How do we weigh the equitable factors here when that question is unresolved? Judge, I believe that the court below created a scheme that would allow that question to be addressed at a later time when the specific buyer was picked out and vetted by the special master. Sure, but we have to, right now, one of the questions you were just saying for divestiture is restoring competition to the market. That's why it's a favored remedy in those circumstances. And the whole question of the public interest prong, as I understand it, the fourth prong of the equitable analysis is whether you're restoring competition. And because we don't know who, if anyone, is going to take over this divested entity, I have no idea if it'll restore competition. Do I? Judge, in the brief that the Justice Department submitted in the district court below, we laid out the principles that the Justice Department uses when crafting a remedy in the form of a divestiture buyer. And the district court heeded much of that brief in its reasoning and its divestiture opinion. And it identified the fact that the critical piece is that there would be an additional supplier of door skins for the independent purchasers. And that would be the touch point that the Justice Department would use to decide whether competition had been restored in the market. I would move just briefly to the evidentiary question and press the point that there is no such thing as a government approving a merger under the antitrust laws. Inaction is not approval. And the cases that Gelblen cites in its brief do not raise doubt about this fact. The two appellate court cases, Ginsburg and Alberta Gas, are both cases where the DOJ sued and then settled. And the court's reliance in those cases on the DOJ's affirmative statements about the market says nothing about the propriety of introducing silence as evidence to a jury. I see that I'm over my time. I thank you for it. The United States requests that the court affirm these two aspects of the district court's decision. Thank you, Ms. Owens. Mr. Horwich. Thank you, Your Honor, and may it please the court, Ben Horwich on behalf of the appellees. I want to remind the court how we got here. Steve's key supplier entered into an unlawful acquisition. The jury found it was unlawful. And if we bracket off for the moment my friend's discussion about CMI evidence, which I do want to take on, it's otherwise Gelblen's not trying to convince the court that this was a lawful acquisition. And the acquisition puts us out of business. And the district court's order remedied that. Those are jury findings. They are district court findings. They are district court equitable judgments. And I've heard precious little about the standard of review of these things. It's not until, I think, very late in the brief, in the 70s or something, we get to an issue that actually gets pure de novo review. And so this case asks what do we do about an unlawful acquisition? What do we do about it going forward? That's the divestiture remedy. And what do we do about the harms that it's caused, which is the antitrust injury question related to the damages verdict. Certainly as a customer, in fact, the largest independent customer of the defendant, we are certainly the right party to bring an antitrust claim of that sort. But all the arguments we're getting here are about how there should be no consequences at all for this unlawful merger. That there won't be any restoration of competition. That there's no liability for putting us out of business. That there's no antitrust damages for the last few years when we had no choice in the market. And never mind all these 17 days of evidence and argument and 149 pages of equitable analysis. There's just going to be no consequences for this merger. Now of those remedies, certainly the most important thing for Steve's is that it wants to stay in business. That's why we sought divestiture. That's what keeps us in business. And as my friend from the government reminded us, the court in American stores says, that is the holding of American stores, private parties can obtain divestiture. And it says that it is, quote, the remedy best suited to redress the ills of an anti-competitive merger. And if this isn't the case where that remedy is best suited, where you take it back to three independent suppliers of door skins from the two, I don't know what case would be. And the district court's conclusion. Yes, Your Honor. Absolutely. I'll ask you what I was asking your friend on the other side. The court's analysis on divestiture, it seemed to me, in many respects, was based on the idea that Steve couldn't have sued and wouldn't have known that it had a claim, an antitrust claim, at the time of the merger or before the merger when it was announced. It seems that many of the injuries you're telling us about have to do not with the contract damages, but with market influences, the 20% you can buy outside of the contract, the way the price is affected by the market and other things like that. Why couldn't Steve have sued? Why wouldn't he have known there was a threatened injury at the time of the merger when it comes to those antitrust injuries? So at the time of the merger, we had a long-term supply agreement that was perpetually renewing. So we would have been in the position of going into court and arguing that, well, hypothetically, if Geldwin breaches the contract or if it terminates the contract, then seven years later, we are going to be remitted back to a marketplace where competition has been lost. I'm not talking about your contract arguments. You have page 35 of your brief. You're trying to convince us this is not a contract case. This is an antitrust case. And so you have bullet points where you talk about outside of the contract, there are market influences that caused us an antitrust injury. And I'm wondering why those weren't suitable for a lawsuit at the time of the merger before you had the breach of contract. Sure. I understand, Your Honor. So those points at the time, you have to remember that we had entered into this contract at essentially the same time as the merger. And under the contract for essentially the first two years, there wasn't any appearance to us that we weren't getting anything worse than what we would have gotten in the market because the contract had a pricing formula where prices would go down when costs went down. And so it's important for the court to distinguish here also between the two different questions of antitrust injury present here. So the antitrust injury analysis for the digestiture issue, that appears at Joint Appendix 3502 and several pages afterwards. That's the district court's analysis of that injury. I don't understand Geldwin to take issue with that. That discussion isn't cited anywhere in its briefs. And that addresses the question of standing under Section 16. And that is something that exists. That's a problem that exists independent of the contract. The injury arises after the contract is terminated. Now, to answer Your Honor's question within the digestiture frame, but the latches frame instead because Your Honor was asking about delay, even if Your Honor thought that we could have sued that early, and I don't think this court wants to write a decision that says as a matter of law we want to invite all of these challenges to rush into court, even when parties can't show the imminence of their injury. But assuming the court did say that, there's two prongs to latches. And the second prong is the prejudice prong. And the district court has a separate set of findings on that issue. And frankly, Geldwin's challenge here is a law school textbook example of why courts of appeals owe deference to district court findings on this. Their challenge here rests entirely on inviting this court to believe the testimony of a witness that the district court disbelieved based on the manner and content of his testimony. This was a witness who testified lies three times in front of the district court. And so even if this court, so I would suggest that if this court has doubts about the delay prong, the court should simply affirm on the fact that Geldwin can't make out the prejudice prong, because that testimony is subject to a credibility finding. And the only other issues they want to raise there is that, well, they say, well, we shut down this plant and we shut down that plant, and the record is to the contrary. I'm happy to point the court to the evidence on that, where they said they shut down the North Carolina plant because of environmental compliance costs, and they had already made the decision before the merger to shut down their Iowa plant. So those can't be prejudiced because of the merger. And so it's just an invitation to reweigh all the evidence. And, of course, the district court is the actor that does that in our system. If I could maybe cycle back to the antitrust injury issue, because I do think that I'm in agreement with my friend on the other side that the question here is a but-for test. That's really what the issue is here. But for the merger, would Steve's have been in the same predicament with respect to those past damages? And the answer is no, we wouldn't have. Because, Judge Rushing, because of the very provisions that you identified, we could have gone out to the market. And this is not something that's invented for appeal. I guess I'd like to take the court to the record on that, because we know what happened before the merger and we know what happened after. What about your friend on the other side's comment that if that was your theory, then your damages didn't link up with that? The way you tried to prove what you could have gotten on the market, you didn't have a but-for damages model, is how I understand their argument to go. I would say two things about that, Your Honor. First is that I think Your Honor correctly recognizes that proof of injury and proof of damages are two separate things. The jury instructions, those are Joint Appendix 643 to 647, separate the two. Those track, as my friend acknowledged, those track the instructions that were provided by Jeldwyn separating those two issues. We have to talk about those things separately, so I'm happy to talk about how the damages model corresponds to that. The whole thrust of Professor Shapiro's testimony, which starts at Joint Appendix 2232 and it goes on for dozens of pages, is that the acquisition kept prices higher than they would have been in the absence of the merger, and that instead, prices would have gone down when costs went down. The reason that should sound familiar is because that's also the formula in the supply agreement. Prices go down when costs go down. They started at the competitive level, negotiated in a price sheet for 2012, and then there's a formula that says prices go down by half the amount that costs go down. The fact that the damages wind up the same is because the reasoning is the same. The contract formula says prices go down as costs go down. If the court would look at 2244, this is in Volume 6 of the Joint Appendix, Professor Shapiro testifies on direct that the contract has prices moving according to a formula based on the competition that took place before the merger. We saw the competition there. Then he does this again on cross-examination. He says, I'm talking about the price before the merger. What happened later with less competition? He's asked, well, your opinion here is that if Geldman's costs went down as you've measured them, then you would expect the but-for world price in the merger didn't take place to have gone down, right? Yes, other things being equal, that's correct. Then he says at 2384, he says, it's justified to think that a good portion of the cost savings would have been passed through. Then he's called as a rebuttal witness. He says it again. This is at 2654, where he says, it's my view in that world with Craftmaster continuing to compete. This is the but-for world, right? The door skin prices would have come down as costs come down, and that's something we never saw. Instead, we saw prices go up. That's why the damage model aligns. I might talk for a minute then about Craftmaster and the evidence, CMI evidence. Craftmaster and CMI are the same entity. The problem for Geldman is it's making a weakened competitor defense. I heard my friend say that the problem is that Steve's was arguing that 3 to 2 really doesn't make – or that Geldman wanted to argue that going from 3 to 2 doesn't really make a difference because the competitor would have been feckless. That is what the weakened competitor defense is. The problem is that the financial weakness they wanted to show is only one element of that defense. I'll spot them that element. I don't think financial weakness is always an antitrust exemption. We would say the airlines are probably financially weak right now, but I don't think all of them ought to get together and merge right now. But let's spot them at the second element. This test is described in our papers. It's quoted on page – we have the 11th Circuit case, but the test is quoted on page 88. The second element there is that there has to be no competitive means for resolving the weakness. This gets at the intuition that yes, it might be that at the end of the day, there's nobody else who can buy the firm, but really from an antitrust policy perspective, Geldman and Masonite I guess also because it's the other supplier, those two firms are the last two on the planet who should own the factory because any other solution keeps it independent and keeps the dynamic of three competitors. The problem for Geldman is that the evidence was the opposite. There were other bidders for CMI. That's a joint appendix 3098. Then Geldman's own expert emphasized that going through a bankruptcy or getting a private equity infusion, that's the pattern that had been seen in the market. I believe it may have been Judge Diaz who referred to that. That's a joint appendix 3085 and 3090 and 3091. Any of those options is preferable. Geldman wasn't offering any evidence that those were impossible, which it would have needed to get this to the jury. Then even if I take that element, even if I spot the mad element, you still get to the third one, which is that they have to also show that the weakness would have been such that it undermines the prima facie case. The prima facie case here is overwhelming in terms of the market share analysis. That's how the prima facie case is done. It's absolutely overwhelming. Professor Shapiro's testimony on that is clear and uncontradicted. This case is a lot like the ProMedica district court decision cited in our papers where for this defense to work, you have to assume that this weakness means that the firm that's acquired goes from something in the teens, the percentage market share in the teens, down to like 2% or 1%. We don't have it. Yes, I'm sorry, Judge Diaz. This sounds like a harmless error argument, and Mr. Clement's response is, well, that should have been something for the jury to have resolved, or you could have made all these points. So I suppose if it's harmless, then it doesn't matter, but go ahead. No, I agree, Your Honor. Harmless error is a perfectly fine way to analyze this because it can't have been harmful error if the jury would not have had a legally sufficient basis to find for Gelbin on the defense. There wouldn't have been evidence in the record on those second and third prongs of the defense, so the jury can't properly have a verdict. And, in fact, we know there wouldn't have been evidence because at Joint Appendix 3089, Gelbin's own expert says that he's not offering – we asked him, so you don't offer your own view on what the but-for world would have looked like absent the merger, is that fair? Answer, I don't specify what would have happened. So how were they going to offer evidence that would meet this defense if their own expert isn't going to testify to it? What this report was left with was this zombie bit of evidence that couldn't have made a difference to the jury if the jury was properly following the law and, if anything, was going to confuse the jury into thinking that the test was something otherwise. Can I ask you a question about this lost profits issue? And Mr. Clement obviously takes issue with the way in which the evidence played out with respect to lost profits. But is it – I mean, with the jury having found a rather substantial amount of lost profits in this case, which by definition suggested that there was a remedy of some kind short of divestiture, why shouldn't the case end there? Well, the reason it shouldn't end there is that that lost profits is not – that is not a substitute for the company continuing in business. Because what we have, the loss of a business, the court could think of it as the paradigmatic loss of all kinds of goodwill. And goodwill is the standard commercial irreparable injury, or loss of goodwill is. And the total annihilation of a business, which is what we're facing here next year, is a loss of goodwill from our customers, loss of goodwill with our other suppliers, loss of goodwill with our employees, loss of goodwill with the communities we're in. It's everything. It's everything from the 154 years that we've been in business. And that's what – So I understand that. So none of that was actually factored into this lost profits calculation, or was it? No. The lost profits calculation, our damages expert computed just over eight years of lost profits after the termination of the supply agreement. So it's eight years. And I would point out that the number, although I think we shouldn't collect the lost profits award because I think the divestiture remedy is the way to solve this, but the lost profits, I heard my friend suggest that maybe we collect 10% more, 10% overcharge on the skins going forward. We buy 50 or $60 million of skins a year, and so it's about $6 million a year. And that's what our damages expert offered for lost profits. So the award isn't wrong. It's just incomplete because it doesn't keep us in business. If I could take a minute to talk about just the fact that this is an uncommonly seen remedy because I think Geldwin is asking the court to say, well, you shouldn't order the remedy because nobody's seen it before. The problem with that logic is that actually what's rare here are Section 7 cases, merger cases like this, where there's actually goes to a finding of liability. Geldwin actually doesn't, nobody cites in the papers any Section 7 case where the court or the jury properly found liability in a private party case. And the reason for that is that the Justice Department and the Federal Trade Commission are very good at their jobs, but with respect to my friend, they're not 100% perfect, and some things get through, and as the government has reminded the court, the private parties have an enforcement role here. But even in that subset of cases, it's going to be really rare because most parties who might challenge a merger aren't going to have this extreme form of irreparable injury that we're facing here. Judge Rushing, yes, I apologize. I'd like to ask you about, you mentioned that private parties do have a role to play. Partly what they're doing is trying to enforce the public interest against anti-competitive agreements, and as I asked the counsel for the government, how on earth can we tell whether divestiture is in the public interest here when we don't know if it might be Steve who gets the divested entity or who it would be or if anyone, and if it may or may not have any chance of success? How do we weigh that in our equitable analysis? It's an important question, Your Honor, because I do think this court needs to be able to look at that question, and the district court crafted a process that follows the Supreme Court's recognition in the Brown Shoe case that you have to do that in two steps because you create a chicken-and-the-egg problem if you say, well, we have to know that there's going to be something for sale because you can't before you find a buyer, but then if you say, well, we have to find the buyer before we know if something's for sale, you're not going to be able to do either of those things. So what the district court did, what was done in Brown Shoe and what the Supreme Court approvingly said is the district court – On Brown Shoe, just to be clear, I take your point that the Supreme Court made the very logical point in Brown Shoe that it's unless you have a court order saying that this is okay, it might be hard to find a buyer, but they didn't say – they didn't go through this sort of equitable analysis and say you can balance out the harms when you have no idea who, if anyone, and maybe the competitor who sued, the customer who sued, would take over this divestive entity. So I take your point that Brown Shoe is relevant. I don't think it resolves whether this is an appropriate analysis that we're trying to undertake here. The logical way to implement that teaching from Brown Shoe is that the district court should resolve everything that it can without knowing the identity of the particular buyer. That's the first thing it needs to do, and obviously there was plenty for the district court to look at on that score that didn't depend on the identity of the buyer. Second, the district court needs to figure out if there is likely to be such a buyer, and the district court did conclude that it's likely. You have to remember this factory has changed hands twice in the last 20 years, and there were multiple interested bidders last time, so these are good conditions for it to work. And then, and this is very important, then the district court is going to have to look at that question when the actual divestiture transaction is proposed with a particular buyer, and I assume that at that point, the district court is likely to have the benefit not only of the special master and the investment bankers involved there and the district court's own knowledge of the market, but of course the Department of Justice has taken an interest in the case, and obviously it will have the opportunity to weigh in, and then this court can review that order. This court can review that order. We are not suggesting this is the last time that this court will ever look at the case. Now, obviously, there's a lot more issues involved here than there would be at that last step where the court would look and consider, well, has the district court actually assessed the buyer correctly? But, so within the scope of this court's mandate, where we aren't going to revisit issues that are open now, absolutely this court has to be able to look at that question. But what Brownshoe says is that we can't get to that point unless we tell buyers that there's something for sale. In fact, it's contrary to the public interest not to follow the Brownshoe process because you're not going to attract the best buyers. So Your Honor referred to the possibility that Steve's might bid for the company. We might, but obviously other companies aren't going to express their interest until they know something is for sale. And so the surest way to see about other bidders, and there were other bidders who got farther in the process the last time around than we did, the surest way is to tell them there is something for sale, let's proceed forward with it. I see I'm over my time. If the court had questions about other areas, though, I would be pleased to address them. Thank you, Mr. Horwich. I guess one of the ultimate ironies here would be if this divestiture resulted in further antitrust litigation, but hopefully it won't come to that. We would hope it is narrow in focus. Thank you, Your Honor. Thank you, Mr. Horwich. Mr. Clement, you've got some time for rebuttal. Thank you, Your Honor. I'd like to make a few points in rebuttal. I want to start with the government's point where they tried to say that there's nothing magical about the point of consummation. I think they overstate that. I do think that the way a lot of merger litigation takes place is that you hold the assets separate until the court resolves the merger, and then after the preliminary injunction hearing that takes place, before the combination of the assets, you resolve those issues, and then you combine them. I think that reflects the reality that the combination is an important point. The consummation is an important point. But we're not talking about somebody who brought their challenge two weeks after consummation. We're talking about somebody who waited four years, and that is just too late as a matter of law. And to Judge Rushing's point, to the extent they really think that their injury was the failure to be able to take advantage of that 20% clause because of the merger, it was obvious the day of the merger. At the point that they entered the contract with us, they knew that Masonite didn't want to sell them doors. So if CMI is merging with us, they have a contractual right to buy 20% of the doors from somebody else, but the merger makes that right much less valuable on day one than it was without a merger. So it's just the most gobsmackingly obvious, if that's an injury, if that was their theory, and it's not the one they pursued, but if that's their theory, that was gobsmackingly obvious on day one, and yet they waited years and years and years to sue. So I think last year was an absolute barrier here. My friend said, well, even if we were too late, there was no prejudice. Even Judge Payne, who found everything against us and discredited most of our witnesses in the remedial hearing, he recognized there was still prejudice. This Tawanda plant has the newer tech and exterior door trim lines. They have nothing to do with door skins, but they're part of the same assembly plane. We're going to lose all our investment in that, all of the profits, all the integration of that business in with the rest of our business. So there's prejudice, and they waited way too long. Now, let me talk about the question. My friend, and I think this is important, Judge Floyd, because you asked about it, he can see they have to show but for injury. And what Mr. Horwich tells you is, well, Mr. Shapiro, Professor Shapiro, he said, yes, prices should have been lower. But first of all, on cross-examination, he was specifically asked, did you calculate the prices and how much lower they are? And he said, no, I haven't made those calculations. The second thing, and I'll get back to this, is on cross-examination, he could not have been confronted with CMI's weakened condition. We desperately wanted to cross-examine him and say, are you sure prices would be that much lower? Because here's evidence of CMI's weakened condition, which would make them a price taker. They would not have made the prices any lower even if they were in the market. They would have simply rode on the coattails of Masonite and Jogwin and got as much as they could to try to continue to stay afloat. That was absolutely critical evidence to cross-examine Professor Shapiro on the issue that Mr. Horwich himself says is the critical point in this case. But there's still yet another problem, which is Professor Shapiro's, even though he did testify that prices were lower, that doesn't map up to the damages model. What they said was they paid too much to Jogwin was not based on a calculation of what they would have paid in the absence of a merger. One of the big complaints, the biggest part of the contractual damages, is we didn't pass on our cost reductions from the Tawanda plant. That's the measure of damages? That can't be a but-for measure of damages, because in the but-for world, we don't own Tawanda. In the but-for world, we have invested in Tawanda to make it more efficient so that the costs go down so that they, under the contract, get lower prices. And it's not enough for Mr. Horwich to say, well, that damages and injury is different. Comcast says your damages model has to line up to your antitrust injury, your antitrust impact. If you go back and re-read the grandfather of all of these antitrust injury cases, Brunswick against Pueblo, they say there's no need for new proceedings, a new damages trial, because the only damages theory offered, which is that the bowling alleys would have been better off if the competitor went out of business instead of what was fought by Brunswick, their only damages model did map up to their antitrust injury. So I want to finish on the CMI point, because I think it's absolutely critical. Mr. Horwich's only explanation for why the Tarbos area excluded that evidence is because we couldn't have proven the other elements of a failed company defense. But we weren't trying to prove a failed company defense. We weren't saying that CMI would necessarily be completely out of business. We were saying that they would be weakened and would not be materially affecting prices. That's what we wanted to use to cross-examine Shapiro. That's absolutely critical. And General Dynamics, Supreme Court, and International Harvester's Seventh Circuit could not be more clear that evidence of a target's weakened financial condition is relevant, even if you are not making a failed company defense. So it cannot be harmless error that we couldn't satisfy the other elements of the failed company defense, and that wasn't even what we were trying to do, and that's why we wanted the evidence, which was critical to cross-examine Shapiro. Thank you, Your Honor. Oh, sorry. Thank you. I wanted to ask you a question about the equitable argument you made. You said that the merger made the portion of the carve-out agreement, the 20% carve-out agreement, much less valuable. And so I guess this gets back to the question of what is enough to show an anti-trust agreement? That sounds like something peculiar to the plaintiff, not necessarily a harm on the market, or do you say that that was enough to show a harm on the market at that point? Well, I want to be clear, because ultimately I don't think there was a harm to the market, so I'm arguing this issue comes up sort of on the assumption of Jennifer Eschen's question, which is that there is at least a potential anti-trust problem with the possibility that prices would go up and that 20% carve-out would be less valuable. So on that assumption, which is in part contrary to many of the questions that come up mostly in the remedial context, I would say that there would be an obvious injury if Judge Winslow is right to seize that matches up to the market and the broader competitive interest. So if the idea is that by going from three to two, prices in the door skin market is going to go up, and that's what the public interest is concerned with, if that's a valid public concern, then Steve's would directly and immediately feel that concern because they would, and again, I think Judge Rush is exactly right in terms of isolating the brief and the bullet points. Basically, they have a fixed-price contract for 80%, and then they have 20% that allows them to buy it from others. And as they morph from the theory they presented, which is contract, to injury to the market and higher but-for prices, they want to focus on that 20%, and that's not what they've proved up, but if that's where their injury comes from, I just can't think of anything more obvious on the day of the merger that their ability to take advantage of that 20%, if they're right, and if the merger is anti-competitive, their ability to take advantage of that 20% should have been absolutely glaringly obvious. I think that would be true in any case, but particularly when, and this is a fact known in disputes, that back in 2012, by virtue of them agreeing to a long- Steve's agreeing to a long-term agreement with Geldman, Mace and I told Steve's, we're done with you, don't darken our door, we don't want you to come here to buy door skins, so for a company that knows that it can't buy that 20% from Mace and I, and knows that the merger takes out CMI, who would be the next most logical person to buy from, if that's a problem, and we think it's not, because we don't think they actually gave up much because CMI was a weakened competitor, and I think you know that we think that now, but if CMI was a valid competitor, and they're going away and Mace and I won't sell to you, that 20% cart out is effectively worthless, and they knew that from the day of the merger, so if that were really their theory, then they should have brought the suit then and said no, we want to preserve that 20% as a meaningful opportunity, now again, I don't think that was ever the suit they actually brought, but if that were the suit, and if that's what gives them an antitrust injury, that antitrust injury, which to answer your question, aligns perfectly with the public interest, was there on day one. All right, thank you. Either of my colleagues have any additional questions? All right. On behalf of the panel and the board, I want to thank the council for their very able arguments and their equally helpful briefs. This is a very difficult and complex issue, but I think I'll speak for my colleagues confidently that your arguments here today and the briefs will help a long way in our hopefully resolving this case. Well, it'll be correct regardless, because we said it, at least for now. But we would typically come down from the bench and shake council's hand and greet you. Obviously, we can't do that, except virtually. So on behalf of my colleagues in the court, thank you very much for participating in these video arguments and allowing us to continue to do our very important work as best we can, given the circumstances. So with that, I'd ask the clerk to adjourn court. This honorable court stands adjourned, Senator Dyck. I thank the United States and this honorable court. Thank you very much.
judges: Albert Diaz, Henry F. Floyd, Allison J. Rushing